argument is Utah Native Plant Society versus the U.S. Forest Service. Good morning and may it please the court. Erin Paul on behalf of the Utah Native Plant Society and Grand Canyon Trust. I'd like to reserve three minutes for rebuttal. If you've got that as close to you as you can get it. This is one day when the podium is as high as it'll go, but I can get the mic closer. Well, yeah, don't get too close. I mean, don't overdo it. Just stand naturally. I think will be the best approach here. Fair enough, Your Honor. The core purpose of research natural areas is to set aside examples of what happens naturally if parts of our national forest system are left alone. The Forest Service created the Mount Peel Research Natural Area to serve as a benchmark for what a high alpine region in the desert southwest should look like. The mountain goats had never occupied the Mount Peel RNA or the national forest surrounding it until the state of Utah flew goats over the desert and released them about a half mile from the forest boundary, knowing and intending that the mountain goats would make a new home in the national forest and the RNA. And the Forest Service said, we didn't do this. The state did this. It's the state's problem. That's essentially the agency's response, Your Honor. Yeah. The Forest Service has rules for managing RNAs that are meant to protect that purpose, and they require the Forest Service to disallow the sorts of occupancy and uses that it can allow elsewhere in the national forest system. And those rules are at the core of the two claims on appeal that the district court dismissed for lack of subject matter jurisdiction. That dismissal was erroneous for two reasons. One, there were final agency actions to review because Forest Service made definitive determinations that it lacked jurisdiction to control the state of Utah's transplants of mountain goats and that it would not promptly remove the mountain goats from the Mount Peel RNA or the forest around it. And those determinations opened the door for the state to make an unpermitted and unregulated use of the national forest and the RNA. And two, there was a failure to act that the court could redress because the RNA rules deprive the Forest Service of any discretion to allow non-native transplanted mountain goats to occupy and modify the Mount Peel Research Natural Area. Are you first arguing that the state had no right to bring in the mountain goats on their own property? We are arguing that the forest... No, my question is very simple. Are you arguing that the states didn't have a right to put mountain goats or the goats on their own property? Yes, so long as the state knew and intended that they would use and occupy the forest. Yes, Your Honor. OK, then how do you propose to keep a wild animal from migrating one place or the other? I mean, by any court order or by any action by any individual, they're going to go where they're going to go. That's absolutely true, Your Honor. And what I would suggest is those really aren't the facts here. The goats didn't cross the desert themselves. They were flown across the desert. They could not... But the state, you're not arguing that the state didn't have the right to do that. The state has the right to bring in just like New Mexico did when it brought in the goats into New Mexico. Is that correct? The state does not have a right to do that without a permit from the Forest Service. I'm not talking about putting them on... I'm talking about the state putting goats on state property. I would concede, Your Honor, if the goats were put on state property and stayed there, then this case wouldn't exist. They have the right to do that. It's because the state intended to make a use of the national forest system that the permitting rules were triggered. So is it your suggestion, then, that the Forest Service needs to build a fence to keep the goats off of the federal property? What we were asking was for the Forest Service to assert its permitting authority and put the state to a choice about whether to apply for a state? I mean, they're the actor here. Yes, Your Honor. There are, as you know, complex jurisdictional and other complexities for having a cause of action against the state. And even if the state is the bad actor here, it doesn't absolve the Forest Service of abiding by its own rules. As this matter progressed, there was an exchange, basically, of letters and complaints from your group to the Forest Service and the Forest Service back to you. Where is the final agency action here? What do you point to? Because that's really the key of this. We can't review under APA unless we have a final agency action. Sure, Your Honor. As you know, we made three requests to the agency, and those appear in the record at APA 72, APA 322, and APA 325. And the requests involved, one, that the Forest Service prohibit additional transplants into the forest and RNA, two, that it regulate the transplants that had already occurred or any future transplants that might occur, and three, that it promptly remove the goats from the RNA and the forest surrounding it. And the agency responded to those requests in a series of letters. There are two in the record that are crucial to the outcome of the case. One of them was from a regional forester in May of 2015, that's at AP 75, and the other was from the chief of the Forest Service, the top ranking official in the Forest Service in August of 2015, that's at AP 77 to 78. And in those responses, the agency dealt with each of our requests. On the first two requests, concerning prohibiting additional goat transplants and permitting the transplants that had already occurred, the agency, as you noted, said, we don't have jurisdiction to control what the state does on state land. And that jurisdictional determination is the final agency action on those two requests. There's no argument in this case, Forest Service has never claimed that it's still thinking about its jurisdiction. It gave its last word on that question, and it had legal consequences because it gave the state a right to make an unpermitted and unregulated use of the forest. The goats are still there, occupying and using the forest and RNA. The third request, the agency responded to in a bit different way. It said, look, you've asked us to promptly remove the goats. We made that rules, have a strict command about managing the RNA that, in our view, doesn't allow the agency to let goats occupy or modify the RNA. Forest Service said, we're not going to remove them promptly. We're going to take a different course of action. And it embarked on an open-ended, five-year monitoring plan that has no preordained outcome, right? It said, look, we're going to monitor the goats for a number of years, and then we'll consult with the state, and at that point, figure out what to do. We might remove the goats, we might not. And just so they say, we'll look into this and we'll get back to you. And that's a final agency decision. It's a final agency action that satisfies the first prong of the Bennett v. Speer test, that the agency consummated its decision-making process because... Well, had they consummated it? I mean, they're looking at it, and we don't know, at the end of this five-year look, what they'll say. They may agree with you. They may say, this is horrific. That's correct, Your Honor. But they also might disagree with us. And the important point here is, I think, to focus on the request we made, which was for prompt action, and we have a final decision that the Forest Service won't take. Well, that's a question that remains debatable as to why you're here. But those just seem to be questions of a decision-making process, not the They're studying it, and they have the right to do that. But I don't see... It's hard for me to see, on the basis of the letters that have gone, where the final action is. The question goes back, where is the final action taken by them? And I see processes, but I don't see an accumulation that this is what's going to be our final decision. Sure. I'd make two points in response to that, Your Honor. One, if you look at our letter, especially in January of 2015, this is at 322. We specifically requested that the goats be removed within six to eight months. The Forest Service clearly said, in its response from the Chief in August 2015, we're not going to do that. And it chose to take a completely different course. That's what we're saying. They chose to take a different course, which means, then, that they see an action that they can take, possibly, rather than having to go out and try to round up a thousand goats. Yeah, at that point, understood, Your Honor. It was a handful of goats at that point. The other point here that I would make is that the path the Forest Service adopted to monitor the goats, it's not relevant to the legal outcome in this case, and not relevant to whether the goats are allowed to occupy or modify the RNA. The RNA's command is strict. It says no occupancy under a special use permit. Right, and given that strict legal... Who has the special use permit? I'm sorry, Your Honor. There is no special use permit in this case, is there? No, the Forest Service has not issued a special use permit to the state to occupy the RNA. Did the state request one? No, Your Honor, they didn't. Okay.  And as a consequence, monitoring for five years doesn't change the legal question that we're raising on the merits, which is whether it was unlawful or arbitrary and capricious to allow the goats to occupy the RNA, despite the RNA's rules. And that question can be answered by the court, the district court below, and that's why there's a final agency action on this request. Let me briefly turn to the failure to act claim. Here, the question is whether the RNA rule gives the Forest Service any discretion to allow mountain goats to modify and occupy the RNA. Or in the terms of Norton v. Suwa, is there a discrete agency action that the agency is required to take? And again, we point to what I would call the twin commands in the RNA rule that say, the Forest Service will retain the RNA in a virgin or unmodified condition, and that occupancy under a special use permit shall not be allowed. And those two commands deprive the agency of the discretion to allow non-native transplanted mountain goats that have never before been in the La Salle Mountains, never before been in the RNA, to occupy and modify the research natural area. Now, how do you propose, and this is just a question of interest to me, how do you propose, assuming that the goats are moved off the federal property, back onto the state property, how do you propose to keep the goats from going back? Tell them you can't go back? Well, Your Honor, I think that the clear way to accomplish that is to fly them back over the desert to the Tushars and put them back where they came from initially. They would never get to La Salle in that scenario. I'll take the rest of my time for rebuttal. Thank you. May it please the Court, Jared Bennett on behalf of the federal defendants. I'd like to clear up a couple of factual issues that have been raised by the appellant's argument today. Number one, it's important to keep in mind that the RNA that they're concerned about is quite a few miles away from the release point. But more importantly, if we look on page 160. But the goats are there, right? I'm sorry? The goats are in the RNA, are they not? They have had access to it. Whether they're hanging out there entirely is certainly in dispute, and there's no record evidence showing that they have taken up permanent residence there. This is especially useful to consider if we look at page 160. Well, the point is they shouldn't be there at all. Whether they come and go or take up permanent residence is not really the point, is it? Well, it is relevant to what they're trying to say here, is that the RNA is being destroyed. But the RNA consists of 0.2% of the national forest land in this area. This is not a massive area. This is 2,830-some-odd acres, which consists of two-tenths of 1% of the forest land. Not to mention the hundreds of thousands of acres of... I don't know how that is relevant, really. I mean, if you have something that is pristine, even though there's a small amount of it, isn't it something that should be preserved and kept? Well, indeed, the Forest Service, that's what... So the fact that it's 2% of whatever million acres the Forest Service manages is not really the point. Well, it's certainly not the point, but it's important contextually. To understand the landscape that we're talking about for purposes of background, Your Honor. Because certainly talking about the final agency action, which is really at issue here, it's important to understand that the Forest Service decided to defer this action until it was able to study this problem more, which is what it needs to do for two reasons. Whenever it makes a decision like this, where it has basically inherited the GOAT release, the state has the right to do on its own land, the Forest Service is now confronted with an issue. If we make a decision to remove the GOATs, the state most certainly has the opportunity to then sue the Forest Service and say you can't do that under the APA and under NIFMA and UC and some of these other statutes that defers the states to... If the GOATs are on Forest Service land, why couldn't they remove them? Why couldn't the Forest Service remove them? They certainly can, and that's the Hunt decision, Hunt versus United States. However, that case was decided back in the 1920s, before there was NIFA, before there were these other statutes, and before there was an APA, which allowed people to challenge final agency action. So if the Forest Service is going to undertake removal action, it needs to have evidence that that is what is necessary to do in order to avoid a lawsuit from the state saying that that action is arbitrary and capricious. If we go to the next step, which is what the plaintiffs are asserting here, that the Forest Service needs to take some action to enjoin the state from doing this again, this is even more problematic. First of all, the Forest Service can't file a lawsuit on its own behalf, which is something the appellants have failed to address. The Forest Service can only ask the Department of Justice to do that, and the Department of Justice undertakes an independent review of whether to file a lawsuit. I have yet to see any case that the plaintiffs have cited that has any court ever ordering the Department of Justice to file a lawsuit against the state of Utah to enjoin it from using its land. That's simply not practical, but that's exactly what the plaintiffs are asking them to do here. But let's assume all that happens. If the Department of Justice were to file a lawsuit against the state of Utah to enjoin it from any further releases of mountain goats on its own land, it better have evidence that the mountain goats that the state is releasing is affecting the Forest Service to the point where it's undermining the very purpose for which it was created. That is the standard that has to be applied as we cited in our brief in Minnesota v. Block. That also requires evidence. Now, to determine whether... Can I just get you to address, though, whether there was final agency action here? I mean, in the sense that I understand you're suggesting what might have happened, but I'm wondering if you could just focus here. You're opposing counsel's argument is that they asked you, could you stop the mountain goats, and you said no. So can I get you to address why is that not final agency action? Absolutely. Because instead of saying no, we're not, what the Forest Service said is we need to look at it further. Further study is the commencement... And I guess that's the question. We're going to look at it further. Isn't that a rejection? Isn't that a no? I think that's what their argument is. At least the decisions that we have thus far in explaining what final agency action means seem to suggest that further study does not final agency action make. In fact, it's the beginning of agency action. Final agency action has to have first... There has to be a culmination of some decision-making process. This is not a culmination, but the beginning, because the Forest Service needs to study the impacts of these goats on this land, these goats it didn't ask for. What is happening on the land? So what actions are you going to take? That's assuming they have a right to even be there. The question is, on the limited fault that, as I understood, you answered a question a while ago, that you acknowledge that they don't have a right to even be there. That's a difficult question because Congress has delegated... I know it is. That's why I'm asking it again. Right. Fair point. All I'm saying is that Congress has said in two different statutes, so MUSEA, Multiple Use and Sustained Yield Act, as well as the Forest Service Organic Act. The Forest Service regulations mimic those and say that the state has primacy in determining how to manage wildlife, including on the Forest Service. So the Forest Service is in this situation where it has to manage its forest, but at the same time work with the state in terms of managing wildlife. And so where the state decides to put mountain goats on its land, and those mountain goats then wander over to state land, or excuse me, to federal land, this is not something that the federal government typically issues a special use permit for. And I think it's telling that the plaintiffs were ruled against in the district court as to whether a special use permit was necessary, and yet they didn't appeal that decision. So it is surprising for me to hear that this is such a prominent issue in their argument when they didn't even appeal that. The district court ruled that issuing a special use permit for wildlife to the state would be, quote, a bureaucratic calamity. Because if a special use permit were required for state-managed wildlife to wander onto federal land, that means that there would need to be a special use permit for every animal that slithers, flies, swims, or crawls its way onto federal property, which just cannot be the case. The state made a decision, its management decision, which it is entitled to do, with primacy over wildlife management, to release mountain goats on its land. I'm not really sure what its intent was, that's not in the record, but even assuming that they truly intended for them to just occupy and take over the forest, that doesn't really matter. Because what matters is the Forest Service has to study this issue to determine now that this is the current condition, what do we do about it? And study is required. Now, if the plaintiffs are concerned that this decision is taking too long, the APA has a way for them to receive relief. That is found in Section 555B of the APA. At the bottom of Section B, Congress specifically states that the agency has a duty to resolve issues or to act within a reasonable time. Section 706.1 allows courts to compel agency action unreasonably delayed. The standards for this were expressed in this court's decision in Quest Communications v. FCC. That's found at 398F3, specifically 1239. Is that in your brief? No, Your Honor. If it's not, if you could give us a 28J letter to give us that sign. I will because this is in response to the reply memorandum. It simply stated that there were five factors this court considers in looking at whether agency action is unreasonably delayed. And that is taking into account the statutory requirement, the length of the delay, the impacts of the delay, as well as the administrative impacts on the agency and the complexity of the problem. Those five factors are far more useful in terms of evaluating the agency's response time than simply calling it final agency action where there has been no administrative record prepared and having this court review something. Has Utah Native Plant Society sought relief under 555B? No, Your Honor. They have not said that the challenge they have made was to say that the Forest Service saying we're going to study more is final agency action under 706.2. Their 706.1 claim is to say the Forest Service had an obligation to remove the mountain goats, which it doesn't because there is no statute that provides that discrete agency action. What 555B says is that the Forest Service has an obligation to resolve the request from them in a reasonable time. And so if the five-year study period that the Forest Service has undertaken is, to them, unreasonable, that is their lawsuit. But they haven't filed such a claim here. We're only here under 706.2, final agency action, which is not here. And as I was alluding to earlier, it's not here for another reason, simply because the Forest Service is in this position where Congress has delegated to it to make decisions about how to manage a forest. And when it has to make those decisions to manage a forest, it has to interact with state agencies. This can be a very complex and at times politically charged interaction. And the Article II branch of government is far more suited to be able to make these determinations than the Article III branch of government, which is why courts have for decades waited for the agency to make that decision so that it can be reviewed instead of jumping in early, which is what the plaintiffs are proposing, which would be inappropriate here. For that reason, this isn't final agency action. As to the 706.1 claim, the failure to act, the plaintiffs have not quite read clearly enough Sewell v. Norton, because the arguments they make here are really the same arguments that the plaintiffs made in that case. Because in the RMPs, the resource management plans at issue in Sewell v. Norton, there certainly was a standard that BLM had to manage for, specifically regarding trail usage. FLPMA also had a standard in it as to how the BLM was to manage. However, that mere standard was not enough. And if the plaintiffs in Sewell v. Norton were wrong in saying, look, there is no other way to do this other than to stop ATV use on these trails, and the Supreme Court said no, the statute doesn't say that, it's not a specific discrete agency action, then the regulation the plaintiffs cite here suffers from the same deficiency. There is no discrete agency action expressed in the regulation or the statute. It provides a management standard. I think very tellingly, we look at Wyoming v. the Department of the Interior, where this court decided whether the Wild Horses and Burros Act contained a discrete agency action sufficient to make the agency remove excess horses from the range. That act specifically states that under certain conditions the agency is to remove horses. That's what it says. It's a discrete agency action that can be compelled. The R&A regulation doesn't even mention any action that needs to be taken. It mentions only a management standard. Tellingly, and I think relating back to why this isn't final agency action, the Forest Service has not even had a chance to interpret what those words mean. The plaintiffs obviously want to have a very strict construction of what this regulation means, but the Forest Service through this decision hasn't had a chance to apply that regulation because it hasn't made a decision yet. For that reason, this isn't final agency action, and there is no agency action to be compelled. If the plaintiffs think this is taking too long, there is a remedy for that, but they haven't accessed it or availed themselves of it. For this reason, the dismissal of the district court was appropriate and should be affirmed in its entirety, and we submit. Thank you. I'd like to pick up where opposing counsel left off on the failure to add claim. On the Wyoming v. Department of Interior case, Mr. Bennett in the Forest Service's brief concedes that the command in that statute, the Wild Free Roaming Horses and Burros Act, to immediately remove excess animals from the range is indeed a discreet one that the agency would be required to take if the predicate determinations were made that triggered that action. That's just a semantic argument when he distinguishes that act from the RNA rule in this case. The Free Roaming Horses Act could just as easily say that after the two predicate determinations are made, the Bureau of Land Management shall immediately disallow excess animals to occupy the range, and it would have the same effect. Here, the RNA rule has a strict command about occupancy. The Forest Service doesn't need additional evidence to determine whether the goats are occupying the research natural area. It's clear that they are, and for that reason, they have no discretion to allow the mountain goats to stay in the research natural area. Unless the court has additional questions, I'll waive the balance of my time. Thank you. Thank you, counsel. Thank you both for your arguments this morning. The case is submitted.